IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-559-F

BAYER CROPSCIENCE, LP,

)
)
)
Plaintiff,                            )
)
)
)                    **ORDER**
v.                                    )
)
NUFARM AMERICAS, INC.                 )
)
)
)
)
Defendant.                            )

This matter is before the court on the Motion to Dismiss [DE-27] the Amended Complaint

filed by Defendant Nufarm Americas, Inc. The motion has been fully briefed, and is ripe for ruling.

## I. PROCEDURAL BACKGROUND

Plaintiff Bayer Cropscience, LP ("BCS") initiated this action by filing a Complaint for

Declaratory Judgment [DE-1] ("Original Complaint") on December 8, 2010. In the Original

Complaint, BCS named Etigra, LLC ("Etigra"), Gro-Pro LLC d/b/a Etrigra ("Gro-Pro") and Nufarm

Americas, Inc. ("Nufarm") as defendants (collectively, "the Nufarm defendants"). BCS sought an

order from this court declaring that a 2008 Settlement Agreement between BCS, the Nufarm

defendants, and other parties, did not release the Nufarm defendants from any obligation to pay BCS

compensation for Etigra and Gro-Pro's use of BCS's Imidacloprid[1] data in support of their applications for registration of certain products containing Imidacloprid.

After receiving an extension of time, Nufarm filed a Motion to Dismiss [DE-16] the Original Complaint arguing that (1) the court lacked subject matter jurisdiction over the action; (2) BCS had failed to join its affiliate, Bayer CropScience AG ("BCS-Germany"); and (3) the court should exercise its discretion and decline to exercise jurisdiction over the declaratory judgment action. With regard to its argument regarding subject matter jurisdiction, Nufarm argued, *inter alia*, that the original complaint failed to allege facts necessary to support diversity jurisdiction and failed to state a claim arising under federal law. Etigra and Gro-Pro later filed a motion to dismiss [DE-19], adopting the arguments Nufarm set forth in support of its own motion.

BCS responded by filing a Notice of Voluntary Dismissal as to its claims against Etigra and Gro-Pro (collectively, "Etigra/Gro-Pro"), and filing an Amended Complaint [DE-24] naming only Nufarm as a defendant. The Amended Complaint, unlike the Original Complaint, contains specific allegations regarding the identity, principal place of business, and state of incorporation of its general and limited partners. Amended Compl. ¶ 2-3. BCS again seeks an order from the court declaring that the Settlement Agreement did not release *Nufarm* "from any obligation it may otherwise have to pay compensation to BCS for citation to and reliance upon BCS's Imidacloprid data for" registrations of certain products containing Imidacloprid. Amended Compl. ¶ 40. BCS does not seek a declaration of rights with regard to Etigra or Gro-Pro.

Nufarm again responded by filing a Motion to Dismiss [DE-27], raising three arguments: (1)

---

[1] "Imidacloprid is the active ingredient in several widely used insecticides." Amended Compl. [DE-24] ¶12.

the court should exercise its discretion and decline to exercise jurisdiction over BCS's request for declaratory judgment; (2) BCS's Amended Complaint must be dismissed for failure to comply with Federal Rule of Civil Procedure 19; and (3) the Amended Complaint must be dismissed for lack of subject matter jurisdiction.

## II. FACTUAL BACKGROUND

To grasp the nature of the facts of the current action, an understanding of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq.*, and two previous actions before this court is necessary.

### A. FIFRA

"Since 1970, pesticide manufacturers have been required to register their products with the [Environmental Protection Agency] prior to sale or distribution." *Cheminova A/S v. Griffin LLC*, 182 F. Supp.2d 68,72 (D.D.C. 2002)(citing 7 U.S.C. § 136a(a)). As a precondition for registering a pesticide, FIFRA requires applicants to show that its pesticide will not cause "unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5). Applicants may submit their own test data to meet this burden, or may rely on "data that appear in the public literature or that previously had been submitted to" the EPA. 7 U.S.C. § 136a(c)(1)(F). If an applicants chooses to rely on another registrant's data, the EPA "may consider the data submitted by the citing applicant . . . 'only if the applicant has made an offer to compensate the original data submitter.' " *Cheminova*, 182 F. Supp.2d at 68(quoting 7 U.S.C. § 136a(c)(1)(F)(iii)). In short, FIFRA establishes a "mandatory data-licensing scheme." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 572 (1985)(quotation and citation omitted). As part of that scheme, "[i]f the original data submitter and the follow-on registrant cannot reach a negotiated agreement regarding compensation, either party may initiate

3

'binding arbitration proceedings.' " *Cheminova*, 182 F.Supp. 2d at 68 (quoting 7 U.S.C. § 136a(c)(1)(F)(iii)). The binding arbitration is governed by the Federal Mediation and Conciliation Service ("FMCS"). 7 U.S.C. § 136a(c)(1)(F)(iii). "The arbitrator's decision is subject to judicial review only for fraud, misrepresentation, or other misconduct." *Union Carbide*, 473 U.S. at 573-74.

Prior to 1978, if negotiations failed between the parties, the EPA determined the amount of compensation, subject to judicial review. *Id.* at 573. Congress amended FIFRA to include the current binding arbitration mechanism because of "the logjam of litigation that resulted from controversies over data compensation and trade secret protection," and because the "'[EPA] lacked the expertise necessary to establish the proper amount of compensation.' " *Id.* (quoting 123 Cong.Rec 25709 (1977)(statement of Sen. Leahy, floor manager of S. 1678)). Congress chose the binding arbitration mechanism as an alternative to EPA-determinations in part, because "compensation payable should be determined to the fullest extent practicable, within the private sector." *Id.* (quotation omitted).

**B. Use of BCS's Imidacloprid data**

BCS alleges that Etigra/Gro-Pro cited and relied upon BCS's Imidacloprid data–previously submitted to the EPA by BCS–in support of applications for the registration of 18 products, set forth in the table below:

4

| Original Registrant | Original EPA Reg No | Current Registrant | Current EPA Reg No | Product Name | Approval Date | Transfer Date |
|---|---|---|---|---|---|---|
| Etigra LLC | 81959-16 | Nufarm Limited | 35935-64 | ET-016 | 6/27/06 | 3/10/09 |
| Etigra LLC | 81959-20 | Nufarm Americas Inc. | 228-693 | Imida E-Ag -- 4 F Cotton Insecticide | 7/11/06 | 6/25/09 |
| Etigra LLC | 81959-21 | Nufarm Americas Inc. | 228-694 | Imida E-Ag 1.6 F Insecticide | 7/11/06 | 6/25/09 |
| Etigra LLC | 81959-18 | Nufarm Americas Inc. | 228-691 | Imida E-Pro 0.5 -- Turf Insecticide | 7/11/06 | 6/25/09 |
| Etigra LLC | 81959-19 | Nufarm Americas Inc. | 228-692 | Imida E-Pro 1% G -- Orn Insecticide | 7/11/06 | 6/25/09 |
| Etigra LLC | 81959-22 | Nufarm Americas Inc. | 228-695 | Mallet 2F T&O Insecticide | 7/17/06 | 6/25/09 |
| Etigra LLC | 81959-24 | Nufarm Americas Inc. | 228-697 | ET-024 | 7/24/06 | 6/25/09 |
| Etigra LLC | 81959-23 | Nufarm Americas Inc. | 228-696 | ET-025 | 7/26/06 | 6/25/09 |
| Etigra LLC | 81959-28 | Nufarm Americas Inc. | 228-699 | Adonis 2 F PPC Insecticide | 11/13/06 | 6/25/09 |
| Etigra LLC | 81959-29 | Nufarm Americas Inc. | 228-700 | Adonis 75 WSP PPC Insecticide | 11/13/06 | 6/25/09 |
| Etigra LLC | 81959-31 | Nufarm Americas Inc. | 228-701 | ETI 105 25 I | 2/21/07 | 6/25/09 |
| Etigra LLC | 81959-32 | Nufarm Americas Inc. | 228-681 | Mantra 60 WSP | 4/2/07 | 3/31/08 |
| Etigra LLC | 81959-34 | Nufarm Americas Inc. | 228-682 | ETI 105 12 I | 6/12/07 | 3/31/08 |
| Gro-Pro LLC | 79676-25 | Nufarm Americas Inc. | 228-636 | Imida E-Ag 5 F ST Insecticide | 9/28/06 | 6/24/09 |
| Gro-Pro LLC | 79676-81 | Nufarm Americas Inc. | 228-681 | Mantra 60 WSP | 4/2/07 | 6/24/09 |
| Gro-Pro LLC | 79676-56 | Nufarm Americas Inc. | 228-656 | ETI 105 28 I | 4/27/07 | 6/24/09 |
| Gro-Pro LLC | 79676-82 | Nufarm Americas Inc. | 228-682 | ETI 105 12 I | 6/12/07 | 6/24/09 |
| Gro-Pro LLC | 79676-68 | Nufarm Americas Inc. | 228-668 | Imida E-Pro 4 F Pre/Post Construction Insecticide | 11/26/07 | 6/24/09 |

5

Amended Compl. ¶ 13.  BCS alleges that in a June 21, 2006 letter to BCS, Etigra/Gro-Pro made

an offer to pay BCS for the right to rely upon BCS's Imidacloprid data to support the applications

for registration of the first eight products identified in the above table.  Amended Compl. ¶ 14.

BCS also alleges that Etigra/Gro-Pro subsequently made multiple offers to pay BCS for the right

to rely upon BCS's Imidacloprid data to support the applications for registration of the remaining

ten products identified in the above table.  Amended Compl. ¶ 15.  BCS and Etigra/Gro-Pro

apparently thereafter began negotiations with regard to compensation for the use of the

Imidacloprid data.

## C.  Patent Litigation

On March 19, 2007, Etigra/Gro-Pro filed a complaint in this court alleging claims for

unfair competition under common law and pursuant to the Lanham Act, 15 US.C. § 1125(a);

tortious interference with contract; unfair and deceptive trade practices.  Etigra/Gro-Pro also

sought a declaratory judgment that its E-Pro Turf Fertilizer ("E-Pro TF"), a product that included

both plant fertilizer and Imidacloprid, did not infringe U.S. Patent No. 5,783,203 ("the '203

patent"). *See ETIGRA LLC v. BAYER CROPSCIENCE LP*, Case No. 5:07-cv-108-F, Complaint

at DE-1 (hereinafter, "the Patent Action").  Etigra/Gro-Pro named BayerCropscience LP, Bayer

Cropscience Holdings, Inc., Bayer Aktiengesellschaft, and BCS as defendants. *Id.*  Etigra/Gro-

Pro later filed an amended complaint alleging similar claims against only BCS and BCS-

Germany. *See* Amended Compl., Ex. A [DE-24-1].  BCS and BCS-Germany asserted

counterclaims against Etigra/Gro-Pro, but no claims for data compensation were raised in the

Patent Action.  Amended Compl. Ex. B [DE-24-2].  The parties eventually filed a joint motion to

stay the '07 patent litigation, stating that Nufarm had announced that Etigra/Gro-Pro had agreed

6

to be acquired by Nufarm in an asset sale. *See* Patent Action at DE-68. The parties stated that BCS and Bayer Cropscience AG had engaged in discussions with Nufarm "in which it appears that they have reached an agreement in principle for resolution of this matter in the context of Nufarm's acquisition of Etigra." *Id.* at ¶ 2. The parties requested the action be stayed. After the parties' joint motion was allowed, the parties filed a stipulation of dismissal. *See* Patent Action at DE-70.

BCS contends that as part of the disposition of the Patent Action, it, along with BCS-Germany, entered into a Settlement Agreement with Nufarm, Etigra/Gro-Pro, and two other parties (Frick Services, Inc. and Control Solutions, Inc.) involved in a separate patent action in this court over the '203 patent. The Settlement Agreement stated that Nufarm had "agreed to purchase substantially all the assets of the business of Etigra[2], including the assets pertaining to the imidacloprid business of Etigra." Amended Compl., Ex. C [DE-24-4]. The parties agreed that, in exchange for consideration, BCS and BCS-Germany released Nufarm and Etigra/Gro-Pro from "any and all claims . . . arising out of or relating to . . . the acquisition by Nufarm of the assets of Etigra." *Id.* at p. 2. The Settlement Agreement provided that "any suit to enforce or interpret this Agreement shall be brought before the United States District Court for the Eastern District of North Carolina, and shall be enforced under the laws of the State of North Carolina." *Id.* at p. 5.

**D. Negotiations over Imidacloprid data compensation**

BCS alleges that all of the registrations identified in the above table were transferred by Etigra/Gro-Pro to Nufarm, and that both Etigra and Gro-Pro have since been dissolved as

---

[2] In the Settlement Agreement, "Etigra" referred to both Etigra LLC and Gro-Pro.

entities. Amended Compl. ¶¶ 16-18. BCS contends that following the transfer of the registrations, all of its negotiations regarding data compensation have been with representatives of Nufarm. Decl. of Mark McAuley ¶ 8 [DE-34]. Nufarm allegedly has informed BCS that the Settlement Agreement released it from any obligation to make payment to BCS for compensation for Etigra/Gro-Pro's use of the Imidacloprid data. Amended Compl. ¶ 35. *See also* Decl. of Mark McAuley, ¶ 9 [DE-34], Ex. B [DE-34-1]. Nufarm allegedly has stated it will not make any payment for the disputed data compensation obligations absent a court order directing it make such payment. Decl. of Mark McAuley ¶ 10. Nufarm also allegedly refused to finalize a settlement agreement regarding other non-Etigra/Gro-Pro Imidacloprid data compensation claims unless the agreement provides a release for Nufarm's data compensation obligations for the Imidacloprid products identified in the chart in this order. *See* Decl. of Mark McAuley, ¶ 13.

Thereafter, BCS initiated this suit, seeking a declaration that the Settlement Agreement does not release Nufarm from any obligation to pay BCS compensation for Etigra/Gro-Pro's citation to and reliance upon BCS's Imidacloprid data for the registrations. In both the Original and Amended Complaints, BCS reserved "the right to pursue binding arbitration pursuant to the procedures set forth by FIFRA in order to seek data compensation from Nufarm Americas and to have an arbitrator, if necessary, determine all other issues associated with BCS's right to and amount of such compensation." Amended Compl. [DE-24] ¶ 8.

### III. ANALYSIS

Nufarm's Motion to Dismiss the Amended Complaint raises three arguments: (1) the court should exercise its discretion and decline to exercise jurisdiction over BCS's request for declaratory judgment; (2) BCS's Amended Complaint must be dismissed for failure to comply

8

with Federal Rule of Civil Procedure 19, and (3) the Amended Complaint must be dismissed for lack of subject matter jurisdiction. Although Nufarm characterizes its first argument as its "primary argument," the court cannot reach it until it is satisfied that it has subject matter jurisdiction over the action. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.")(quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).

## A. Subject Matter Jurisdiction

"The district courts of the United States are courts of limited subject matter jurisdiction." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citing *Exxon Mobil Corp. v. Allapattah Servs. Inc.*, 545 U.S. 546, 552 (2005)). They are not courts of general jurisdiction, and only possess the jurisdiction authorized them by the United States Constitution and by federal statute. *Id.*; *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (*en banc*). When a federal court lacks subject matter jurisdiction, the case must be dismissed. *Interstate Petroleum Corp. v. Morgan*, 249 F.3d 215, 219 (4th Cir.2001) (*en banc*); *Vuyyuru*, 555 F.3d at 347; *United States v. Beasley*, 495 F.3d 142, 147 (4thCir. 2007) ("subject matter jurisdiction concerns a court's very power to hear a case").

In this case, Nufarm makes a facial challenge under Rule 12(b)(1) to subject matter jurisdiction. Accordingly, the court's review is limited to the allegations in the complaint, which the court assumes to be true. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

BCS's Amended Complaint alleges four grounds for subject matter jurisdiction: (1)

9

diversity jurisdiction under 28 U.S.C. § 1332; (2) federal question jurisdiction under 28 U.S.C. § 1331 because "this controversy arises from a settlement agreement entered into as part of a patent infringement lawsuit brought in this court under the patent laws of the United States;" (3) federal question jurisdiction under 28 U.S.C. § 1331 because the "dispute involves a determination regarding the jurisdiction of this dispute to be heard under FIFRA, and (4) the Declaratory Judgment Act, 28 U.S.C. § 2201. Nufarm contends that the allegations in the Amended Complaint fail to establish subject matter jurisdiction under any of these grounds, arguing that (1) the Amended Complaint fails to establish complete diversity; (2) the Amended Complaint only presents issues of state contract law and fails to arise under federal statute, including FIFRA, and (3) the Declaratory Judgment Act does not provide an independent basis for jurisdiction. The court agrees with Nufarm's latter two arguments, and for the reasons cogently stated in the Memorandum in Support of the Motion to Dismiss the Amended Complaint [DE-28] at pp. 18-22, which the court ADOPTS and INCORPORATES herein, the court determines that it has neither federal question jurisdiction over this action nor jurisdiction premised solely on the Declaratory Judgment Act.

The court, cannot, however, agree with Nufarm's first argument regarding diversity jurisdiction. A district court has original jurisdiction over matters where there is a complete diversity of citizenship between all the plaintiffs and all defendants, and where the matter in controversy exceeds $75,000.00. 28 U.S.C. § 1332; *Athena Automotive, Inc. v. DiGregorio*, 166 F.3d 288, 290 (4th Cir. 1999). For diversity purposes, a corporation is deemed to be a citizen of any state in which it has been incorporated and where it has its principal place of business. 28 U.S.C. § 1332(c)(1). A limited partnership, on the other hand, is a citizen of each state in which

10

any of its partners are citizens. *Carden v. Arkmoa Assocs.*, 494 .S. 185, 195-96 (1990). A review of the Amended Complaint shows that BCS specifically alleges that the amount in controversy exceeds $75,000. Amended Compl. ¶ 6. Moreover, the allegations in the Amended Complaint show that BCS, a limited partnership, is deemed to be a citizen of Delaware, New York, and North Carolina. *Id.* ¶¶ 2-3. Nufarm, a corporation, is deemed to be a citizen of Illinois. Accordingly, complete diversity exists between Nufarm and BCS.

Nufarm, however, contends that Etigra and Gro-Pro are necessary and indispensable parties, and must be joined in this action, which will in turn destroy this court's diversity jurisdiction. Nufarm's arguments in this regard are best assessed under Rules 12(b)(7) and 19, discussed later in this order, and not Rule 12(b)(1). The court therefore concludes, on this facial challenge, that the allegations in the Amended Complaint establishes that this court has diversity jurisdiction over this action.

## B. Other Jurisdictional Challenges

Nufarm also contends that this action is not ripe, nor should the court exercise jurisdiction over the action, and therefore the action should be dismissed.

BCS brings this action under the Declaratory Judgment Act, 28 U.S.C. § 2201, which provides that "in a case of actual controversy . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). In keeping with this provision, the Fourth Circuit has determined that two conditions must be satisfied for a court to have jurisdiction over a declaratory judgment action. *White v. Nat'l Union Fire Ins. Co.*, 913 F.2d 165, 167 (4th Cir. 1990). First, the court must make the "constitutional inquiry"– is the dispute a

11

"case or controversy" within the confines of Article III of the Constitution? Second, the court

must make the "prudential" inquiry: is the court, in its discretion, satisfied that the declaratory

relief is jurisdictionally appropriate? *Id.* Nufarm contends the present action does not satisfy

either inquiry.

**1. BCS has satisfied the constitutional inquiry**

With regard to the constitutional inquiry, "[t]he test for a 'case or controversy,' . . . is

whether the dispute 'is definite and concrete, touching the legal relations of parties having

adverse legal interests.' " *White*, 913 F.2d at 167 (quoting *Aetna Life Ins. Co. v. Haworth*, 300

U.S. 277 240-41 (1937)). As such, there " 'must be a real and substantial controversy admitting

of specific relief through a decree of conclusive character, as distinguished from an opinion

advising what the law would be upon a hypothetical state of facts.' "*Id.* quoting (*Aetna Life*, 300

U.S. at 241)). Accordingly, "the question in each case is whether the facts alleged, under all the

circumstances, show that there is a substantial controversy, between parties having adverse legal

interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."

*Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). To answer that

question requires consideration of "the fitness of the issues for judicial decision and the hardship

of the parties of withholding court consideration." *Texas v. United States*, 523 U.S. 296, 300-01

(1998)(internal citations omitted)). The burden of demonstrating that an action is ripe for

adjudication falls on the party asserting the existence of jurisdiction. *Miller v. Brown*, 462 F.3d

312, 319 (4th Cir. 2006). A court may consider evidence outside the pleadings in deciding

whether an action is ripe. *Ventian Casino Resort, L.L.C. v. E.E.O.C.*, 409 F.3d 359, 366

(D.C.Cir. 2005).

12

In the context of ripeness, "[f]itness means that the issues to be considered are 'purely legal' and further factual development will not aid the court in its resolution." *Allen, Allen, Allen & Allen v. Williams*, 254 F.Supp.2d 614, 625 (E.D.Va. 2003)(citing *Virginia Soc'y for Human Life v. Fed. Election Comm.*, 263 F.3d 379, 390 (4th Cir. 2001)). In other words, a claim cannot be ripe if it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998)(internal quotation marks omitted). Accordingly, courts have determined that there was no "case or controversy" where a plaintiff seeks a declaration that the defendant's anticipated affirmative defense is invalid where there is no definite underlying dispute or threat of imminent injury. *See, e.g., Jones v. Sears Roebuck & Co.*, 301 Fed. Appx. 276, 283-84 (4th Cir. 2008)(agreeing with other "courts that have deemed a challenge to an arbitration provision, in the absence of an underlying dispute or imminent injury, to be nonjusticiable").

For example, in *Tamplenizza v. Josephtal & Co.*, 32 F.Supp. 702 (S.D.N.Y. 1999), the plaintiff filed a suit against a securities firm, seeking a declaration that an arbitration agreement between the two was void. The plaintiff alleged he had various claims against the defendant firm, but did not allege that he had attempted to bring a claim against the firm in any judicial forum or in arbitration, or that he had any plans to do so in the near future. *Id.* at 703. The court remarked that such allegations "[a]t best, strain[] the concept of 'case or controversy' to its outer limit," and a decision on the merits of the case would amount to a "mere declaration of law . . . advising him of his right to bring a suit at some undisclosed time in the future." *Id.* at 704. The court also remarked that the plaintiff's suit asked the court to assume many things, including that (1) the plaintiff would commence suit at some point in the future, and (2) the defendant, in the

13

face of such a suit, would enforce seek to enforce the arbitration agreement. *Id.* Accordingly, the court, in its discretion, dismissed the suit. *Id.*

Nufarm makes a similar argument in this case, contending that in the absence of the initiation of FIFRA arbitration, the relief BCS seeks concerns only "a potential defense that may or may not be raised." Mem. [DE-28] at p.8. In other words, Nufarm contends that until arbitration is initiated, there is no definite dispute between the parties.

The court disagrees. Unlike the court in *Tamplenizza*, resolution of the declaratory judgment claim does not require the court to make numerous assumptions. First, the filings in this case, coupled with the knowledge of the FIFRA mandatory-licensing scheme, show the parties have a genuine, and not hypothetical, dispute about Nufarm's obligation to pay data compensation to BCS. Under FIFRA's scheme, the original data submitter and the applicant first must engage in private commercial negotiation to determine the terms and amount of compensation; if negotiation is unsuccessful, then either party may initiate binding arbitration. The Amended Complaint and the rest of the record show that BCS and Nufarm have been engaged in the first stage of the FIFRA scheme; under the unique FIFRA scheme, BCS's claim for data compensation is not just a hypothetical possibility.

Second, the court does not need to assume that Nufarm will raise the defense that the release provision in the Settlement Agreement relieves it from any obligation of paying data compensation to BCS for Etigra and/or Gro-Pro's reliance on Imidacloprid data. In the course of the parties' commercial negotiations–which are mandated by the FIFRA scheme–Nufarm already has raised the defense. *See* Decl. of Mark McAuley [DE-34] ¶¶ 8-10; Ex. 2 [DE-36.3]; Amended

14

Compl. [DE-24] ¶ 23.[3] Thus, the applicability of the release provision is no longer a hypothetical defense. Moreover, it appears that the negotiation process has come to a standstill as a result of the assertion of this defense. Initiating arbitration will not bring the matter into focus any more than it is now, especially because–as Nufarm appears to concede–the applicability of the release provision more than likely is not an issue that may be arbitrated. Given the unique structure and realities of the FIFRA scheme, the court concludes that no more factual development necessary and the declaratory judgment claim indeed presents issues fit for judicial decision.

The court also finds that BCS will suffer hardship if the court withholds consideration of the action. An authoritative federal practice treatise explains that to assess hardship "the court must inquire whether the subject of the challenge presents a true dilemma for the parties, or whether their course of action would be unlikely to be altered regardless of any decision that the court could render." 15 MOORE'S FEDERAL PRACTICE § 101.80 (Matthew Bender 3d ed.). Again, the filings indicate that the first stage of the FIFRA data compensation process has come to a standstill as a result of Nufarm's assertion of the release provision defense. The resolution of whether the release provision applies to BCS's data compensation claims is therefore a "true

---

[3] The court finds the second declaration of Geoff Quick, offered to show that he did *not* tell BCS's Mike McAuley on September 10, 2010, that Nufarm would not make a payment for data compensation for Imidacloprid products absent a court order, to be less than persuasive. Quick appears to take issue with the fact that McAuley references "Imidacloprid Products Identified in the Amended Complaint," noting that "no 'Complaint–amended or otherwise–had been filed on September 10, 2010 identifying any specific 'Imidacloprid Products.' " Second Decl. Geoff Quick [DE-36.1] ¶4. The court finds Quick's attempted wordplay to be neither cute nor clever. More importantly, taking Quick at his word still leads the court to believe that Quick *did* make the statement that Nufarm would not make data compensation to BCS for Imidacloprid products absent the court order; he just did not mention a "complaint."

15

dilemma" between the parties. There appear to be little value in making BCS initiate arbitration only to have to come back to this court or another court for a decision on the applicability of the general release provision, especially when all the circumstances indicate that the defense *will* be raised in arbitration. *See* Corrected Geoff Quick Decl. [DE-29.1] ¶¶ 7-8 (explaining that in his view, Nufarm made a substantial cash payment to BCS and BCS AG in exchange for a broad general release of claims). Accordingly, the court concludes that BCS has met its burden in showing that this action constitutes a case or controversy within the meaning of Article III, and is therefore ripe.

### 2. BCS has satisfied the prudential inquiry

A court must answer two questions when determining whether to exercise its discretion and assert jurisdiction over a declaratory judgment action: "(1) whether the judgment will serve a useful purpose in clarifying the legal relations in issue [and] (2) whether the judgment will terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding." *White*, 913 F.2d at 168 (citations and quotations omitted). In this case, the answer to both of these questions is yes.

As BCS notes, the resolution of the issue presented in this action will allow the parties to either resume negotiations–the first stage of resolution of data compensation disputes under FIFRA–to determine the amount of data compensation Nufarm will pay BCS, or will render the dispute as resolved if the court determines the release provision is applicable. In this posture, a judgment in this action will serve a useful purpose in clarifying the parties' legal relations, and will afford relief from uncertainty. Moreover, the court finds Nufarm's arguments against exercising discretion to be unpersuasive. The court does not view BCS as attempting to

16

circumvent FIFRA procedures; BCS is not asking the court to determine the amount and terms of any possible data compensation. Rather, BCS is asking an Article III court to determine an issue arising out of a dispute over the meaning of contractual terms. Nufarm's argument about piecemeal litigation is similarly unavailing. Again, as Nufarm apparently concedes, the contract dispute over the applicability of the release provision will more than likely need to be decided by a court. Therefore, even under Nufarm's preferred procedural course, piecemeal litigation is unavoidable.

Taking into account all of the relevant circumstances, the court finds that both the constitutional and prudential components are satisfied, and this court, in its discretion, may exercise jurisdiction over this declaratory judgment action

## C. Rule 12(b)(7) Motion to Dismiss for Failure to Join a Party Under Rule 19

As discussed above, Nufarm also argues that this action must be dismissed for BCS's failure to join required parties under Rule 19.

### 1. Standard of Review

Rule 12(b)(7) provides for dismissal of an action for a plaintiff's failure to join a party under Rule 19. In turn, Rule 19 sets forth a two-part inquiry for determining whether a court must dismiss an action for failure to join a party. FED R.CIV.P. 19(a)-(b); *American Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005). First, a court examines whether the party is "necessary" or "required" to the action under Rule 19(a). *Wood*, 429 F.3d at 92. Rule 19(a)(1) requires a party to be joined if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so

17

situated that disposing of the action in the person's absence may:

> (i) as a practical matter impair or impede the person's ability to protect the interest; or
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED.R.CIV.P. 19(a)(1).

"If a party is necessary, it will be ordered into the action." *Owens-Illinois, Inc. v. Meade*, 186 F.3d 435, 440 (4th Cir. 1999). If, however, the joinder of the party will destroy diversity jurisdiction, the court must proceed to the second step and consider "whether, in equity or good conscience, the action should proceed among the existing parties or should be dismissed." FED.R.CIV.P. 19(b). In making that determination the court must consider:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
> > (A) protective provisions in the judgment;
> > (B) shaping the relief; or
> > (C) other measures;
> (3) whether the judgment rendered in the person's absence would be inadequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

*Id.* If the court determines that the action should not proceed, it must be dismissed. *Owens-Illinois*, 186 F.3d at 440.

The burden of proof rests with this moving party. *Wood*, 429 F.3d at 92; *Citizen Band Potwatomi Indian Tribe of Oklahoma v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994). When considering a motion to dismiss under Rule 12(b)(7), a court must accept as true the well-pleaded allegations in the complaint, but may also consider extrinsic evidence submitted by the parties. *See Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 479 n.2, 480 n.4 (7th Cir. 2001); *Buttar v.*

18

*November*, No. 3:10cv668, 2011 WL 2375492 at *7 (W.D.N.C. June 9, 2011). A court should order dismissal "only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." *Owens-Illinois*, 186 F.3d at 441. The decision to dismiss the case "must be made pragmatically, in the context of the substance of each case, rather than by procedural formula, by considering the practical potential for prejudice to all parties, including those not before it." *Id.* (internal quotations and citations omitted).

### 2. The court can afford complete relief

Under Rule 19(a), the court must first assess whether complete relief can be accorded to the parties to the action in the absence of the unjoined party. FED. R. CIV. P. 19(a)(1)(A). "The 'complete' relief concept of Rule 19(a)(1) 'refers to relief as between the persons already parties, not as between a party and the absent person whose joinder is sought.' " *Heinrich v. Goodyear Tire & Rubber Co.*, 532 F.Supp. 1348, 1359 (D.Md. 1982)(quoting 3A Moore's Federal Practice P 19.07-1(1) (2d ed. 1979)). *See also United States v. County of Arlington*, 669 F.2d 925, 929 (4th Cir. 1982); *Gen. Refractories Co. v. First State Ins. Co.*, 500 F.3d 306, 313 (3d Cir. 2007)("[W]e necessarily limit our Rule 19(a)(1) inquiry to whether the district court can grant complete relief to persons *already named* as parties to the action; what effect a decision may have on absent parties is immaterial.")(emphasis in original). Rule 19(a)(1)(A) is not implicated simply because an absent party may cause future litigation. *See MasterCard Int'l v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006)("While there is no question that further litigation [involving the absent party] is inevitable if MasterCard prevails in this lawsuit, Rule 19(a)(1) is concerned only with those who are already parties."). Although Nufarm repeatedly asserts the court cannot accord complete relief, it offers no explanation for this assertion. The

19

court agrees with BCS that there is nothing in the record that suggests the court cannot afford complete relief among the two parties currently named in the action.

### 3. No party's ability to protect a claimed interest will be impaired or impeded

Even if the court can accord complete relief, a person may still be required to be joined if that person"claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may as a practical matter impair or impede the person's ability to protect the interest." FED.R.CIV.P. 19(a)(1)(B).

The quintessential cases where an absentee's ability to protect his or her interest will be impaired involve either a limited trough or will have an immediate effect on the absentee. *See, e.g.,* Richard D. Freer, *Rethinking Compulsory Joinder: A Proposal to Restructure Federal Rule 19*, 60 N.Y.U. L. REV. 1061, 1083 (1985)(explaining that although "[f]actual situations may differ, but practical impairment of an absentee's interest arises in [these] two generic types of cases"). In the former, a plaintiff will sue to recover against a limited fund held by a defendant against which the absentee also has a right to recover, such as insurance proceeds or trust funds. *See id. See also R-Delight Holding, LLC v. Anders*, 246 F.R.D. 496, 501 (D.Md. 2007)(explaining that the predecessor to Rule 19(a)(1)(B)(i) was satisfied where the absentee claimed an interest to a deposit that was the subject of suit); *Virginia Elec. & Power Co. v. Bunker Ramo Corp.*, 61 F.R.D. 366, 368 (E.D. Va. 1973)("Cases dealing with [Rule 19(a)(1)(B)] have addressed themselves particularly to situations where a single fund or *res* is the subject of the contention in the suit and an absent party may have a legal right to all or part of that fund."). The absentee could still bring a separate action against the defendant, but if the funds are depleted during the first suit, the victory is meaningless. In the latter situation, an "absentee may

20

be harmed by the entry of an injunction or declaratory judgment against the defendant in an action by a plaintiff whose interests are essentially adverse to the those of absentee." Freer, at 1083 ( stating than an example is an action seeking advanced seniority status for a particular group of employees because the seniority of nonparty employees will be directly affected by a judgment for the plaintiffs). *See also Bates v. Cekada*, 130 F.R.D. 52, 57 (E.D.Va. 1990)(concluding that an absent corporation must be joined where the relief sought in the action would contravene the corporation's articles of incorporation).

Courts have determined, however, that an absent party's ability to protect its interest will *not* be harmed where an extant party will adequately represent the interests of the absent party. *See, e.g., Nat'l Union Ins. Co. v. Rite Aid of South Carolina, Inc.*, 210 F.3d 246, 250-51(4th Cir. 2000). Nevertheless, "[a] court should hesitate to conclude . . . that a litigant can serve as a proxy for an absent party unless the interests of the two are identical." *Id.* at 251.

In this case, Nufarm argues that a judicial interpretation of the release provision has the potential to affect *all* types of claims BCS (and BCS-Germany) might have against Nufarm, Etigra and Gro-Pro. Nufarm also argues that it does not represent the interests of Etigra or Gro-Pro, because the three entities' interests are not identical. Namely, Nufarm contends that prior to its acquisition of the assets of Etigra and Gro-Pro, Nufarm had dealings with BCS and BCS-Germany on a variety of commercial matters that were wholly separate and distinct from Etigra's and Gro-Pro's independent dealings with the BCS companies. According to Nufarm, these separate and distinct commercial matters precludes this court from finding that the interests of Nufarm and the Etigra entities are identical. BCS, of course, disputes Nufarm's characterization.

The court does not find Nufarm's argument regarding representation to be persuasive as

21

to Etigra. It is true that in the most jurisdictions, when an entity purchases all, or substantially all, of the assets of another entity, the purchasing entity generally is not liable for the selling entity's debts or liabilities. *See, e.g., Evans v. McKinley Med., LLC*, No. 5:09-CV-477-BR, 2011 WL 902024 at \*3 (E.D.N.C. March 14, 2011)(citing *Budd Tire Corp v. Pierce Tire Co., Inc.*, 370 S.E.2d 267,269 (N.C. Ct. App. 1988)); *Vernon v. Schuster*, 179 Ill. 2d 338, 345, 688 N.E.2d 1172, 1175 (Ill. 1997). However, in the vast majority of these same jurisdictions, an exception to this rule exists where there is an express or implied agreement by the purchasing entity to assume the debts or liabilities of the selling entity. *Evans*, 2011 WL 902024 at \*3; *Vernon*, 179 Ill. 2d at 345. Here, by Nufarm's own admission, it both acquired the assets *and* became responsible for the liabilities of Etigra. *See* Corrected Aff. of Greg Quick [DE-29.1] ¶ 5. Nufarm, therefore, may be held liable for Etigra's obligations. Consequently, it does have a perfect identity of interest with Etigra, and will adequately represent Etigra's interests.

The same cannot be said, however, as to Gro-Pro. The record indicates that Nufarm did not assume the liabilities of Gro-Pro. *See* Corrected Aff. of Greg Quick [DE-29.1] ¶¶5-6. Consequently, the court cannot find that the interests of Gro-Pro and Nufarm are identical, which precludes the court from finding that Nufarm will adequately represent the interests of Gro-Pro in this litigation.[4] More importantly, the court finds that Gro-Pro has a claimed interest in this action, and its absence from the action will impair or impede its ability to protect the interest. Specifically, the court agrees with Nufarm that this action will require the court to interpret the

---

[4] The court recognizes that BCS alleges, and Nufarm does not dispute, that Gro-Pro as has been dissolved as a LLC under Florida law. As BCS concedes, however, this does not mean that Gro-Pro is not amenable to suit. *See* Fla. Stat. § 608.4431(2)(b) (providing that dissolution of a limited liability company does not "[p]revent commencement of a proceeding by or against the limited liability company in its name").

scope the release provision in the agreement; the parties' filings indicate Nufarm will argue the release provision is a broad, general release, while BCS will argue that the release provision is far more limited. A determination of the scope of release provision is inevitable, and because the release provision may apply to other potential claims against Gro-Pro, it should be a part of this action. *Cf. Nat'l Union Ins. Co. v. Rite Aid of South Carolina, Inc.*, 201 F.3d 246, 251-52 (4th Cir. 2010)(concluding in an action between an insurance company and a subsidiary that the subsidiary's parent corporation was a required party because it negotiated the insurance policy, was responsible for providing notice under the policies, and a determination of the notice issue would have impact on other cases).

**4. The court may not proceed in the absence of Gro-Pro**

Given the procedural history of this action, the court may infer that the joinder of Gro-Pro would destroy diversity jurisdiction. Gro-Pro originally was named as a defendant by BCS. In response to the motions to dismiss filed by Nufarm, Gro-Pro, and Etigra, wherein the defendants argued that BCS failed, on the face of the Complaint, to establish diversity jurisdiction, BCS responded by filing the Amended Complaint and dropping both Etigra and Gro-Pro from the lawsuit. Additionally, BCS does not contest Nufarm's assertion that the joinder of Gro-Pro would destroy diversity. Under these circumstances, this court infers that the joinder of Gro-Pro will destroy diversity jurisdiction in this action. *See Poling v. K. Hovnaina Enterprises*, 99 F.Supp.2d 502, 517 & n.16 (D.N.J. 2000)(citing *Hinsdale v. Farmers Nat'l Bank & Trust Co.*, 93 F.R.D. 662, 664-65 (N.D. Ohio 1982)).

Accordingly, the court must determine "whether, in equity or good conscience, the action should proceed among the existing parties or should be dismissed." FED.R.CIV.P. 19(b). The

23

Supreme Court has explained that the four interests listed in Rule 19(b) reflect the following concerns which must be balanced: (1) the plaintiff's interest in having a forum; (2) the defendant's desire to avoid multiple litigation, inconsistent relief, or sole responsibility for a liability he shares with another; (3) the interest of the outsider whom it would be desirable to have joined; and (4) the interest of the courts and the public in complete, consistent and efficient settlement of controversies. *Provident Tradesman Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109-11 (1968). "A Rule 19(b) analysis is not mechanical; rather it is conducted in light of the equities of the case at bar." *Nat'l Union*, 210 F.3d at 252.

In this case, the court finds the first, third, and fourth interests to be particularly relevant. Weighing these interests, the court concludes that dismissal is appropriate in this case. The court recognizes BCS's contention that the judgment in this action can be narrowly drawn to only apply to BCS, Nufarm, and the issue of the responsibility for the Imidacloprid compensation. Nevertheless, the court is of the opinion that the resolution of that narrow issue still will require the court to make determinations on the breadth of the contested release provision. *Cf. Nat'l Union*, 201 F.3d at 253. Given this fact, and given that there is an appropriate forum–North Carolina state court–where all the parties may be joined, the court finds that the public's interest in a complete settlement of this controversy outweigh's BCS's interest in choosing this federal forum. Because the court concludes that this action may not proceed in the absence of Gro-Pro, Nufarm's motion to dismiss [DE-27] is ALLOWED.[5]

## IV. CONCLUSION

---

[5] Because the court finds that the action must be dismissed due to the inability to join Gro-Pro, the court does not reach the arguments regarding BCS-Germany.

For the foregoing reasons, the Motion to Dismiss Amended Complaint [DE-27] is ALLOWED. All other pending motions are DENIED as moot. The Clerk of Court is DIRECTED to close this case.

SO ORDERED.

This the 30 day of March, 2012.

James C. Fox
James C. Fox
Senior United States District Judge

25